USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: 3-31-16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x

MARISOL I. SAAD,

                             Plaintiff,

        -against-                              1:15-cv-00686 (ALC)

CAROLYN W. COLVIN, Acting             **OPINION AND ORDER**
Commissioner of Social Security,

                             Defendant.

------------------------------------------------------------- x

**ANDREW L. CARTER, JR., United States District Judge:**

      The plaintiff, Marisol Saad, brings this action to reverse a final decision of the defendant, the Commissioner of Social Security (the "Commissioner"), that Saad was not entitled to Supplemental Security Income ("SSI") benefits. The parties have filed cross-motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

## BACKGROUND

### I. Procedural Background

      Plaintiff filed an application for SSI benefits on February 29, 2012, alleging that her disability began on August 20, 2011. (A.R. 12.)[1] Her application was initially denied on May 3, 2012. After a hearing on June 18, 2013, an Administrative Law Judge ("ALJ") again denied Plaintiff's application on August 20, 2013, finding that she was not disabled. (*Id.*) On December 13, 2014, the ALJ's decision became the final decision of the Commissioner after the Appeals Council declined to review it. (*Id.*) Plaintiff filed this civil action on January 30, 2015, and moved for judgment on the pleadings on July 23, 2015. (ECF Nos. 1, 11.) The Commissioner cross-moved for judgment on the pleadings on November 12, 2015. (ECF No. 21.)

---

[1] "A.R." refers to the administrative record prepared by the Social Security Administration (ECF No. 10).

1

## II. Factual Background

Plaintiff was 34 years old at the time of hearing and living in Yonkers, New York. (A.R. 212.) She had previously worked as a medical assistant, a babysitter, and a salesperson, but she stopped working in 2011. (A.R. 43-44; 219.) She alleges that she became disabled on August 20, 2011, when she began experiencing arthralgia (joint pain), reactive airway disease, memory loss, post-traumatic stress disorder ("PTSD"), depression, anxiety, herniated discs, a torn ligament in her right food, weakness in her left leg, herpes, and hemorrhoids. (A.R. 213, 217)

### a. Evidence at Hearing

Plaintiff testified at a hearing before the ALJ on June 18, 2013. (A.R. 31-52.) She testified that she lived with her three children, ages 15, 12, and 2, and that she did cooking and everything else she was supposed to do to care for them, but that her children had to help her. (A.R. 32-33.) With regard to the two-year-old, Plaintiff testified that she cared for him with the help of her daughters and the wife of her building's super. (A.R. 45-46.) She stated that while she used to go shopping once a month, she had stopped doing so in April 2013 and her daughter did the shopping instead. (A.R. 33-34.) She testified that she spoke to her children about school and attended parent/teacher conferences when she was not sick, and that she sent the two-year-old to the park with her older daughters and sometimes went with them but that she would return home if there were a lot of people in the park. (A.R. 35-36.) Plaintiff also testified that she took public transportation but tried to do so only with her daughters and only if she knew the bus would be empty. (A.R. 36, 46-47.) She stated that once she had fainted on the bus with her son in her arms, and the other passengers had not realized she fainted. (A.R. 47.) She testified that she stopped going to church after she had a panic attack at the church and the pastor looked at her strangely. (A.R. 49.) Plaintiff told the ALJ that she did not have any friends but that she spoke with her sister and had a good relationship with her. (A.R. 34.)

As to her physical impairments, Plaintiff testified that she had pain all over her body. (A.R. 38.) She testified she experienced pain in her neck, where she had a herniated disc that would give her spasms through half her body. (A.R. 37-38.) She was prescribed Gabapentin (a painkiller for nerve pain). (A.R. 38.) Further, she testified that she had a respiratory problem that made her feel as if she could not breathe. (A.R. 41.) She stated she had an "asthma pump" but that she generally had to lie down and wait until she could breathe again. (A.R. 41). Plaintiff also testified to other physical ailments, including: heart pain, hair loss, plantar fasciitis, and a need to urinate. (A.R. 51-52.) Plaintiff testified that the medications she took gave her side effects, including making her feel sleepy and nauseous, and giving her migraines. (A.R. 42.) Plaintiff testified that she had to lie down six to seven times a day. (A.R. 22.)

Plaintiff spoke in detail about her ankle, testifying that she had an ankle sprain which continued to cause her pain. (A.R. 36.) She testified that she no longer used a boot for her ankle because a doctor had told her to stop wearing it in February. (A.R. 37.) Plaintiff testified that she did still wear the boot in March, including to her consultative examination, because "the doctor told [her] [she] had to keep on it because [she] was in pain." (A.R. 38.) In addition, she stated that she used a cane due to her ankle and a "back hernia." (A.R. 36.) She testified that the back hernia caused her so much pain that it would "take [her] left foot" and she would drop to the floor, so she needed the cane to support herself. (A.R. 36.) She testified that she used the cane inside and outside, and while she used it more outside, if she had a lot of pain in her back and needed to go to the bathroom, she sometimes had to use the cane. (A.R. 37.) Plaintiff stated that she used the cane for both standing and for walking. (A.R. 37.) She testified that she was not receiving any further treatment for her ankle at the time of the hearing though she had been sent again to physical therapy for it. (A.R. 39.)

In addition to her physical ailments, Plaintiff testified that she was being treated for depression. (A.R. 39.) She stated that she had been prescribed medication, including medication to take after panic attacks. (A.R. 40.) However, she testified that the treatment had not helped because she was "still crying every day." (A.R. 40.) She testified that her mental impairments prevented her from thinking straight, made her forgetful, and made it so that she could not be where there were a lot of people, as she would feel as if she was suffocating and wanted to hide from everybody. (A.R. 40.) She testified that on a daily basis, she had flashbacks in which she thought her ex-husband was behind the door to hit her. (A.R. 50-51.) Plaintiff testified that she had missed appointments when she felt too bad, i.e. was experiencing too much pain or felt like she could not see people. (A.R. 41.) She testified that the last time she went to the doctor, she had a panic attack, which caused the doctor to her daughter if she was using drugs. (A.R. 42.)

A vocational expert ("VE") also testified at the hearing. (A.R. 53-61.) The ALJ gave the profiles of two hypothetical workers, and the VE identified three jobs that would be available to each hypothetical worker in Plaintiff's region. (A.R. 53-61.)

### b. Other Evidence from Plaintiff

Plaintiff reported to the SSA that her pain preventing her from sleeping and that she experienced an "electric shock from her head and heart" that prevented her from sleeping. (A.R. 225.) She reported that she sometimes forgot to feed herself, to bathe, and to take medications, and that she needed help with laundry and anything involving reaching high places. (A.R. 226-27.) However, she also reported that she prepared food and meals daily and cared for her children. (A.R. 225-226.)

Plaintiff reported that she did not go outside, except for appointments, and that she tried not to go outside without her children. (A.R. 227.) She reported that she could not walk without her cane, could not walk long distances, could not carry heavy things, stand or sit for long

4

periods, could only climb stairs with difficulty, could not kneel, could not squat or reach high places without feeling pain, could not squeeze her hands shut, and had to repeat herself when speaking to remind herself what she was saying. (A.R. 230-31.) She also reported that she was forgetful and felt sad or upset. (A.R. 231.)

    c. **Medical Evidence**

        i. **Physical Impairments**

On October 7, 2011, Plaintiff received a diagnosis from the Morris Heights Health Center of a right ankle sprain/strain after she twisted her ankle stepping on an uneven surface. (A.R. 351, 575.) On November 22, 2011, an MRI of her ankle revealed partial tears of two ligaments, with joint effusion (fluid in the joint). (A.R. 356.) On February 24, 2012, Dr. Donna Alfieri, a podiatrist, examined Plaintiff's right foot and found it negative for erythema and ecchymosis (redness and discoloration), and found no signs of swelling or tenderness. (A.R. 460-62.) On May 12, 2012, Plaintiff again saw Dr. Alfieri, who noted that her left foot had tenderness on palpation and that her right ankle showed an increased range of motion. (A.R. 479.)

On June 19, 2012, Plaintiff complained of chest pains with panic attacks and reported she could walk three to four blocks, "but not fast." (A.R. 490.) She saw a cardiologist, who stated her chest pain could be from a mitral valve prolapse. (A.R. 491.) The cardiologist ordered a cardiac echo stress test, which showed normal results. (A.R. 491.)

On November 7, 2012, Plaintiff saw Dr. Sonia Mukani at Morris Heights Health Center. (A.R. 530-34.) Plaintiff complained of stomach pain, knee pain, and chest pain and shortness of breath. An x-ray of her knee was normal, and her lungs were clear. (A.R. 531-32.) Dr. Mukani prescribed ibuprofen for the knee pain and ordered further tests related to reactive airway disease. (A.R. 532.)

On April 2, 2013, Plaintiff was seen by a different doctor at the Morris Heights Health Center. (A.R. 554-57.) She complained of pain throughout her body, and particularly of abdominal pains and constipation. (A.R. 554-55.) Dr. Jordan Golubcow Teglasi prescribed her medication for gas and constipation and referred her to her primary care physician. (A.R. 556.) Plaintiff returned and again saw Dr. Golubcow Teglasi on April 12, 2013, at which time she complained of a swollen throat and pain in the left side of her neck at night. (A.R. 558-61.) She reported at that time an improvement to her abdominal pain. (A.R. 559.) Dr. Golubcow Teglasi prescribed lidocaine for Plaintiff's sore throat and noted that it was likely viral. (A.R. 560.)

On April 17, 2013, Plaintiff saw Dr. Mukani again to receive lab results. (A.R. 564.) She complained of motion sickness, severe lower back pain, numbness, heaviness of her leg, and abdominal pain. (A.R. 562.) She also complained of multiple joint pain, back pain, and knee pain, and Dr. Mukani noted she was seen for a referral to orthopedics. (A.R. 565.) Dr. Mukani also noted that Plaintiff had failed to follow up on a prior referral but that Plaintiff stated she had never received the referral. (A.R. 565.) Dr. Mukani noted that Plaintiff had a normal gait but tenderness in her lower back. (A.R. 565.) She found Plaintiff's memory to be grossly intact and her affect appropriate. (A.R. 565.) Dr. Mukani referred Plaintiff to orthopedics for a visit and physical therapy. (A.R. 566.)

On March 27, 2012, Dr. Catherine Pelczar-Wissner performed an internal medicine consultative examination. (A.R. 378-82.) Dr. Pelczar-Wissner noted that Plaintiff walked with a cane and a walking boot and that the cane was medically necessary. (A.R. 379.) She noted that Plaintiff could perform a one-quarter squat, did not need help changing for the exam or getting on or off the exam table, and was able to rise from a chair without difficulty. (A.R. 379.) However, she was unable to walk on her heels and toes without difficulty, exhibited an antalgic

gait, had limited range of motion in her ankles, and had a partial tear of two ligaments in her ankle. (A.R. 380.) Dr. Pelczar-Wissner concluded:

> "[Plaintiff] has moderate restriction for walking. She should continue with physical therapy. She has only gone once. She also should be evaluated by psychiatry, as she has a multitude of somatic complaints, as listed above."

(A.R. 381.)

### ii. Mental Impairments

In August 2011, Plaintiff sought treatment for PTSD and depression and was referred to licensed social worker Heidi Kolman at Morris Heights Health Center. (A.R. 435.) At that time, Plaintiff reported a depressed mood, frequent crying spells, irritability, flashbacks, sleep and appetite disturbances, and difficulty with concentration, and she was assessed with a Global Assessment of Functioning ("GAF") score of 47.[2] (A.R. 435-38.) Plaintiff continued to see Kolman through June 2012 and received GAF scores ranging from 47 to 58. (A.R. 402-38.) In the course of her treatment, Kolman diagnosed Plaintiff as suffering from PTSD, major depressive disorder, and panic attacks. (A.R. 402-38.) She consistently checked a box indicating that Plaintiff was "progressing" in her treatment but Plaintiff's GAF score and her reported symptoms, including memory loss, depression, agitation, and flat affect, varied throughout the period. (A.R. 402-38.)

On July 5, 2012, Plaintiff saw Dr. John C. Spiegel, a psychiatrist, at Morris Heights Health Center. (A.R. 515-17.). On September 20, 2012, she saw Dr. Spiegel again, and he noted that she exhibited quiet behavior and depressed mood. (A.R. 518.) He diagnosed her with panic disorder without agoraphobia and assessed her GAF at 58. (A.R. 519.) At that visit, he increased the dosages of Zoloft and Hydroxyzine dosages that he had previously prescribed in July for her

---

[2] Kolman noted a target GAF score of 65 or above before treatment ended.

depression, anxiety, and panic attacks, and switched her from Ambien to Trazadone to help with her sleep. (A.R. 518.) On October 18, 2012, Dr. Spiegel saw Plaintiff and increased her Zoloft dosage again; her diagnosis remained unchanged. (A.R. 524-25.) Her GAF was 58. (A.R. 525.) On November 15, 2012, Plaintiff missed an appointment due to disruptions after Hurricane Sandy. (A.R. 535-36.) On December 6, 2012, Plaintiff saw Dr. Spiegel again and reported, "I am a little better." (A.R. 536.) Dr. Spiegel noted that she needed to get back to her previous regimen of medication "as it has been quite helpful to her." (A.R. 536.) Her GAF was again 58. (A.R. 536.) On January 31, 2012, Plaintiff saw Dr. Spiegel and at her request, he increased her Trazadone dosage, as she reported she was again not sleeping well. (A.R. 543.) Her GAF remained at 58. (A.R. 543.) Plaintiff saw Dr. Siegel twice more, on February 28, 2013, and March 29, 2013; her diagnoses and medications did not change in these visits, and her GAF scores were assessed at 58 and 50. (A.R. 547-53.)

On May 13, 2013, Dr. Spiegel signed a medical source statement, prepared by the social worker, Kolman. (A.R. 583-88.) He opined that Plaintiff would be absent from work more than three times a month (A.R. 584). Further, he opined that Plaintiff had marked or extreme loss in a number of work-related activities, including: understanding and carrying out short, simple instructions; maintaining attention and concentration for extended periods; working with or in proximity to others; making simple work-related decisions; completing a normal workday without interruptions from psychologically based symptoms; asking simple questions; traveling in unfamiliar places, and using public transportation. (A.R. 586-87.) Dr. Spiegel opined that Plaintiff's condition had existed as such since at least 2011. (A.R. 588.)

On March 27, 2012, Dr. Arlene Broska performed a psychiatric consultative evaluation. (A.R. 373-77.) Dr. Broska noted that Plaintiff was cooperative and responsive, and her manner of relating, social skills, and overall presentation were adequate. (A.R. 374.) She found

8

Plaintiff's thinking to be coherent and goal-directed, her mood to be neutral, her affect to be of full range and appropriate in speech and thought content, and her attention and concentration to be intact. (A.R. 375-76.) However, while Dr. Broska noted that Plaintiff could do counting and simple calculations, she could not spell "world" forward or backward and her recent and remote memory skills were mildly impaired. (A.R. 375.) Dr. Broska also noted that Plaintiff's level of intellectual functioning was below average with general fund of information appropriate to her experience. (A.R. 375.) Dr. Broska concluded:

> "It appears the claimant can follow and understand simple directions and instructions. She can perform simple tasks independently. She is able to maintain attention and concentration. She has difficulty performing some complex tasks due to physical difficulty. She can make appropriate decisions. There may be times she has difficulty relating adequately with others and appropriately dealing with stress. The results of the examination appear to be consistent with psychiatric problems and it may impact her ability to function on a daily basis without mental health treatment"

(A.R. 375.) Dr. Broska found to Plaintiff have depressive disorder and panic disorder without agoraphobia, and recommended that she continue with psychotherapy. (A.R. 376.)

On April 18, 2012, state agency psychologist T. Harding assessed Plaintiff and found her to have a medically determinable impairment of depression and panic disorder. (A.R. 387-88.) He found her to have mild limitations as to activities of daily living and moderate limitations as to difficulties in maintaining social functioning, and concentration, persistence, or pace. (A.R. 393.) Across four broad areas—understanding and memory; sustained concentration and persistence; social interaction; and adaptation—he found her to have moderate limitations or no significant limitations. (A.R. 397-99.) He concluded:

> "Based on the information in file, the claimant does not have any marked limitations in any of the 4 basic areas needed for unskilled, entry level work. Claimant would have the ability to understand, remember and carry out instructions . . . Claimant is capable of simple work."

(A.R. 399.)

9

### III. The ALJ's Decision

In his decision, the ALJ evaluated plaintiff's claims for SSI benefits pursuant to the five-step sequential evaluation process set forth in 20 C.F.R. § 416.920. (A.R. 39-47.) First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since February 29, 2012, the application date. (A.R. 14.) Second, the ALJ found that Plaintiff had the following severe impairments: depression; anxiety; panic disorder without agoraphobia; PTSD; ankle sprain, partial tear of right ankle ligaments; plantar fasciitis; and reactive airway disease. (A.R. 14.) Third, the ALJ determined that Plaintiff's impairments or combination of impairments did not meet or medically equal any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1. (A.R. 14.) The ALJ found that the severity of Plaintiff's mental impairments, considered singly and in combination, did not meet or medically equal the criteria of the listings for mental disorder. (14.) Fourth, the ALJ stated:

> "After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except the claimant is limited to occasional climbing ramps and stairs, occasional stooping, kneeling, crouching, and crawling. The claimant should not climb ladders, ropes or scaffolds. She should be permitted to use a cane for ambulation on uneven surfaces, or for prolonged ambulation of greater than 20 feet. The contralateral extremity can be used to lift and/or carry up to the exe11ional limits. The claimant should not be exposed to extreme heat, atmosphe1ic conditions, unprotected heights, or moving mechanical pa11s. She is limited to simple repetitive routine work, with low stress, defined as occasional decision-making, occasional changes in the workplace, and occasional interaction with the general public, co-workers and supervisors."

(A.R. 16.) Based on that finding, the ALJ found that Plaintiff was unable to perform any past relevant work. (A.R. 21.) Fifth and finally, the ALJ determined that, considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (A.R. 21.)

10

## LEGAL STANDARD

"A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. § 405(g)). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (quoting *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004)). This is "a very deferential standard of review—even more so than the 'clearly erroneous' standard." *Brault v. Soc. Sec. Admin., Com'r*, 683 F.3d 443, 448 (2d Cir. 2012). "The Court, however, will not defer to the Commissioner's determination if it is the product of legal error." *DiPalma v. Colvin*, 951 F. Supp. 2d 555, 566 (S.D.N.Y. 2013) (citation and internal quotation marks omitted).

To establish a disability under the Social Security Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The disability at issue must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

"The Commissioner of Social Security has promulgated regulations that set forth a five-step sequential evaluation process to guide disability determinations." *Cichocki v. Astrue*, 729 F.3d 172, 174 n. 1 (2d Cir. 2013) (internal citation omitted). The Second Circuit has described this process as follows:

11

> "[1.] First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.
>
> [2.] If he is not, the Commissioner next considers whether the claimant has a 'severe impairment' which significantly limits his physical or mental ability to do basic work activities.
>
> [3.] If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him *per se* disabled
>
> [4.] Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity[3] to perform his past work.
>
> [5.] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform."

*Selian v. Astrue*, 708 F.3d 409, 417-18 (2d Cir. 2013) (alterations omitted) (footnote added). "The claimant bears the burden of proof in the first four steps of the sequential inquiry; the Commissioner bears the burden in the last." *Id.* (citations omitted).

As the Commissioner proceeds through the five-step process, she must consider four factors in determining a claimant's entitlement to benefits: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Brown v. Apfel*, 174 F.3d 59, 62 (2d. Cir. 1999) (quoting *Mongeur v. Heckler*, 722 F.3d 1033, 1037 (2d Cir. 1983) (internal quotation marks omitted).

---

[3] "The Social Security regulations define residual functional capacity as the most the claimant can still do in a work setting despite the limitations imposed by his impairments. In assessing the residual functional capacity of a claimant with multiple impairments, the SSA considers all his medically determinable impairments including medically determinable impairments that are not severe." *Selian*, 708 F.3d at 418. (citing 20 C.F.R. § 404.1545) (alterations, internal citations and internal quotation marks omitted).

In the assessment of medical evidence, a treating physician's opinion is given controlling weight when that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record . . ." 20 C.F.R. § 416.927(c)(2); *see also Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999). The treating physician's opinion is "entitled to some extra weight, even if contradicted by substantial evidence, because the treating source is inherently more familiar with a claimant's medical condition than are other sources." *Cruz v. Sullivan*, 912 F.2d 8, 12 (2d Cir. 1990)

"In order to override the opinion of the treating physician, . . . the ALJ must explicitly consider, *inter alia:* (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian*, 708 F.3d at 418 (citing *Burgess*, 537 F.3d at 129). After considering these factors, the ALJ must "comprehensively set forth reasons for the weight assessed to a treating physician's opinion." *Halloran*, 362 F.3d at 33. "Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." *Aronis v. Barnhart*, 2003 WL 22953167, at *5 (S.D.N.Y. Dec. 15, 2003) (citing *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)).

## DISCUSSION

Plaintiff challenges the ALJ's decisions on the grounds that it: (1) fails to accord adequate weight to the opinion of Plaintiff's treating psychiatrist; and (2) fails to apply the correct legal standards in determining Plaintiff's residual functional capacity

### I. Application of Treating Physician Rule

In the course of determining Plaintiff's residual functioning capacity at step four, the ALJ stated that he gave "little weight" to the opinion of Dr. Spiegel, while giving "significant weight"

to the consultative examiners and "great weight" to the opinion of the state agency medical consultant.[4] (A.R. 19.)

Under the treating physician rule, the ALJ was obligated to give Dr. Spiegel's opinion "'controlling weight' so long as it is 'well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess*, 537 F.3d at 128 (citation omitted). Here, the ALJ stated that Dr. Spiegel's opinion was "inconsistent with [his] own treatment records, and not supported by other objective medical evidence or the claimant's own testimony regarding her activities of daily living." (19.) However, in order to override the opinion of the treating physician, the ALJ must *explicitly consider* four factors: (1) the frequency, length, nature, and extent of treatment by the physician; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist. *See Selian*, 708 F.3d at 418. The ALJ here considered only two of those factors and thus this Court must remand Plaintiff's case.

The ALJ did not consider the frequency, length, nature, and extent of treatment by Dr. Spiegel, nor did he consider whether Dr. Spiegel was a specialist. Dr. Spiegel treated Plaintiff over the course of eight months and a half-dozen visits. At the heart of the treating physician rule is the notion that the opinion is due greater weight "because the treating source is inherently more familiar with a claimant's medical condition than are other sources." *Cruz v. Sullivan*, 912 F.2d 8, 12 (2d Cir. 1990) (citation omitted). In the context of determining mental health-related

---

[4] While the ALJ addressed the opinions provided by Dr. Spiegel and the social worker, Kolman, jointly, the Court addresses only the opinions presented by Dr. Spiegel, as Plaintiff limits her argument to Dr. Spiegel. The Court notes, however, that the treating physician rule is applicable to licensed social workers like Kolman. *See, e.g., Jacobi v. Colvin*, No. 14 Civ. 3827 (PAE), 2015 WL 4939617, at *10 (S.D.N.Y. Aug. 19, 2015); *Jones v. Comm'r of Soc. Sec.*, No. 13 Civ. 4785 (RRM), 2015 WL 5579847, at *16 (E.D.N.Y. Sept. 22, 2015).

impairments, where a claimant's condition may ebb and flow, that familiarity is of particular import. *See Canales v. Comm'r of Soc. Sec.*, 698 F. Supp. 2d 335, 342 (E.D.N.Y. 2010); *Gorman v. Colvin*, No. 13 Civ. 3227 JG, 2014 WL 537568, at *6 (E.D.N.Y. Feb. 10, 2014). Here, in the context of discounting Dr. Siegel's opinion, the ALJ did not address the nature of the relationship between Dr. Spiegel and Plaintiff. By the same token, he did not discuss the fact that the consultative examiners, the sources to which he gave "significant weight," each only examined Plaintiff only once. *C.f. Avila v. Astrue*, 933 F. Supp. 2d 640, 650 (S.D.N.Y. 2013) (citing 20 C.F.R. § 416.927(c)(2) ("The Commissioner's regulations require that greater weight generally be given to the opinion of a treating physician rather than a non-treating physician.")). Furthermore, the ALJ did not consider whether Dr. Spiegel was a specialist or any differently qualified from the consultative examiners to whose opinions he gave "significant weight."

  The ALJ did, however, address the remaining two factors: the consistency of the opinion with remaining medical evidence and the amount of medical evidence supporting the opinion. He noted that he found Dr. Spiegel's opinion to be "inconsistent" with Dr. Spiegel's own treatment records and "not supported by other objective medical evidence or the claimant's own testimony regarding her activities of daily living." (A.R. 19.) But the Second Circuit requires that an ALJ "comprehensively set forth reasons for the weight assessed to a treating physician's opinion." *Halloran*, 362 F.3d at 33. Here, in his otherwise thorough opinion, the ALJ does not point to any specific inconsistences between Dr. Spiegel's opinion and Plaintiff's own testimony, or between Dr. Spiegel's opinion and other objective medical evidence, and he does not address the fact that Dr. Spiegel rendered his opinion more than a year after the consultative experts rendered their opinions, which goes to the relative weights of the opinions and any discrepancies between them.

  Because the ALJ did not address two of the factors the Second Circuit has held he must "explicitly consider" in assessing the weight to give a treating physician's opinion, *see Selian*,

15

708 F.3d at 418, and did not "comprehensively set forth reasons for the weight assessed" to the opinion, *Halloran*, 362 F.3d at 33, as required by the Second Circuit, the Court must remand.

## II. Determination of Residual Functioning Capacity

In light of the Court's determination that the ALJ's decision did not properly apply the treating physician rule, the Court need not consider Plaintiff's arguments that, in determining Plaintiff's residual functional capacity, the ALJ did not properly evaluate the evidence and that the ALJ's ultimate determination of her residual functioning capacity is not supported by the evidence. On remand, the ALJ may revisit this aspect of his decision as appropriate.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion is granted and the Commissioner's motion is denied. The case is hereby remanded to the Commissioner for further proceedings consistent with this Opinion and Order.

**SO ORDERED.**

Dated: March 31, 2016

**New York, New York**

**ANDREW L. CARTER, JR.**
**United States District Judge**